# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KRIMBILL, BROOKHART, and ARGUELLES[1]
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Sergeant First Class ALAN D. ROSS**
**United States Army, Appellant**

ARMY 20190537

Headquarters, United States Army Training Center and Fort Jackson
Charles L. Pritchard, Jr., Military Judge
Colonel Scott E. Linger, Staff Judge Advocate

For Appellant: Lieutenant Colonel Tiffany D. Pond, JA; Major Kyle C. Sprague, JA (on brief); Colonel Michael C. Friess, JA; Major Kyle C. Sprague (on reply brief).

For Appellee: Colonel Steven P. Haight, JA; Lieutenant Colonel Wayne H. Williams, JA; Major Brett A. Cramer, JA; Major Jonathan S. Reiner, JA; Captain Anthony A. Contrada, JA (on brief).

30 September 2020

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ARGUELLES, Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ].[2] The alleged misconduct occurred in 2017. The court-martial sentenced appellant to a dishonorable discharge, confinement for thirty days, and reduction to the grade of E-

---

[1] Judge Arguelles decided this case while on active duty.

[2] The military judge acquitted appellant of adultery in violation of Article 134, UCMJ.

5. The convening authority elected to take no action on appellant's sentence and the military judge entered final judgment on 10 October 2019.

The case is before the court for review pursuant to Article 66, UCMJ. Appellant raises three assignments of error, two of which we will address. First, he argues that the evidence is legally and factually insufficient. Second, he claims that the military judge abused his discretion in allowing the testimony of a corroborating witness. For the reasons that follow, we disagree and affirm.[3]

## BACKGROUND

### A. Victim's Testimony

In June of 2017, Sergeant (SGT) AK met appellant during her first drill weekend with her new reserve unit. Appellant, a Sergeant First Class working in the S-1 personnel section, helped process her into the unit. Although SGT AK filled out paperwork listing her personal cell phone number, she did not give that information directly to appellant or otherwise ask him to call her.

After her second drill in July, in which she had minimal contact with appellant, SGT AK received a text late on a Tuesday night from a number she did not recognize. After she responded to the text on Wednesday morning, appellant informed her that he was the sender. The two continued to exchange texts that week, including messages where appellant asked SGT AK to send him "sexy-type" pictures. Sergeant AK responded by sending him a few work pictures in which she was fully clothed. Continuing to text during the week, the two made plans to get together that Friday night at SGT AK's apartment to watch movies, eat, and drink.

Shortly after appellant arrived, SGT AK poured alcoholic drinks for them both. While SGT AK was standing on a stool and reaching for the alcohol, appellant

---

[3] Appellant's other assignment of error is that this court lacks jurisdiction because the convening authority elected to take no action on the sentence for a specification alleging the commission of an offense before 1 January 2019. Though erroneous, the convening authority's failure to act on appellant's sentence as required by the applicable version of Article 60, UCMJ, was neither jurisdictional nor prejudicial to appellant's substantial right to seek clemency from the convening authority. *See United States v. Coffman*, 79 M.J. 820 (Army Ct. Crim. App. 2020). We have also given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find them to be without merit.

started kissing her. Per SGT AK, although she did not want to kiss appellant, she could not push him away or get off the stool without being unsure of her footing.

After being kissed by appellant, SGT AK was uncomfortable for "[t]he entire night after that point." After she made the drinks and they both sat down, appellant directed the conversation towards SGT AK's physicality (to include whether her breasts were real), past relationships, and sexual preferences. Sergeant AK attempted to deflect these questions by changing the topic of conversation. Shortly after ordering food around 1930 and not wanting to have this "awkward, dismissive conversation for the rest of the night," SGT AK "very directly" told appellant that she did not want a physical relationship with him. When appellant asked her why not, SGT AK explained that he had access to all of her records, could influence her career, and that she "didn't want him to be attached to my future success."

Rejecting her reasons, appellant instead moved closer, grabbed her hand, and walked her over to the bed that was ten feet away in the living room.[4] When asked what was going through her mind at that point, SGT AK testified:

> At that time, I had spent an hour and half trying to defend, deflect, and dismiss whatever he was trying to make happen. Like I said, at that point it seemed inevitable. I tried giving him lots of reasons that I didn't want it to happen, and they're the right reasons, according to the Army—rank and influence and all that stuff—and he dismissed all of them. I was trying to find anything else that I could do to prevent it from happening.
>
> When he stood up and initiated the physical contact, in my mind, I just had to let whatever was about to happen happen, and just survive until it was done.

After laying her on her back on the bed, appellant undressed them both and started having vaginal sex with her while standing between her legs. Sergeant AK "laid as still as possible to give no indication that [she] wanted it to happen," and subsequently started crying.

At one point during the intercourse, appellant asked "you don't want this do you?" Although SGT AK shook her head no, appellant nevertheless said something to the effect of "I'm sorry, I can't stop," and continued to have sex with her. After appellant paused a short time later, SGT AK opened her eyes and saw him holding

---

[4] Sergeant AK testified that she set up her apartment in a "studio" style, with the bed in the living room next to the kitchen and the bedroom used for storage.

his penis in his left hand. When appellant noticed her looking at him he digitally penetrated her. Wanting it to be over, SGT AK started "participating," thinking that it would help him to perform and finish.

After he finished appellant went to the bathroom, and SGT AK immediately got dressed. When appellant came out of the bathroom, SGT AK left to get the food she had previously ordered. Finding the restaurant closed, SGT AK called appellant and they agreed to get take-out from another establishment. When asked why she returned home instead of just leaving, SGT AK stated that she did not want to leave appellant in her apartment for an extended period of time, and that she had to be at work the next day at 0600.

After SGT AK returned with the food, appellant tried to resume the previous conversation, but she rebuffed him with very short and dismissive answers, to include telling him "I fed you. I fucked you. What else do you want from me?" After finishing her meal, SGT AK lied down on the bed and fell asleep while appellant continued to eat and watch the movie. Sergeant AK woke up to appellant leaving and asked him to turn off the lights, which he did.

Recognizing that she would continue to see him at drill, and needing to "find a path forward with him," on the following Sunday, SGT AK invited appellant to meet her at Paris Mountain State Park. After appellant tried to kiss her at a picnic table, SGT AK again told him that she did not want a physical relationship, "didn't want [it] to happen the night when it did, and I didn't want it to happen going forward."

Sergeant AK reported the incident to her chain of command in September 2017 after she learned a bit more about the appellant and "it clicked to me that perhaps he was a bit more predatorial [sic] and he sought me out with those intentions from the beginning."

On cross-examination SGT AK admitted that the sex was not forceful and that she never said "stop" or "no." She did, however, qualify her response by saying "I had very directly said no for about 10 minutes before this was happening. Saying no one more time didn't seem like it was going to help." When asked about a later text message in which she stated that she liked the kissing on the night of the incident, SGT AK stated that she did not specifically remember liking or not liking his kisses, "but any greater hit on his ego would've had further repercussions for me."

4

*B. Appellant's Testimony[5]*

The relationship between appellant and SGT AK started off as a cordial friendship that included texting. After they agreed to meet on the night in question, appellant arrived at her apartment, and he and SGT AK started drinking and talking, which led to kissing and touching. They ended up on the mattress where there was more mutual kissing and touching, to include appellant putting his finger in SGT AK's vagina. But, per appellant, "[a]ll of a sudden it was just a lull" wherein SGT AK paused, stopped engaging, and was "frozen" with her eyes closed. After he asked if she was good but got no response, appellant kissed her and went to the bathroom. Per appellant, there was no penile penetration. At no point did SGT AK say "no" or stop, nor did she resist.

Although SGT AK was a little distant while they were eating and conversing, appellant attributed that to her being tired and needing to work the next day. After SGT AK went to sleep on the mattress, appellant finished watching the movie and let himself out.

On cross-examination, appellant admitted that he got SGT AK's phone number from her in-processing paperwork, and that she never asked him to call or text her. Appellant did not recall any discussion about things like relationship status when they met up on the night in question, nor did he remember SGT AK saying anything about not wanting to be in a relationship. When they met up at the park the following Sunday, they had a "real brief" discussion about what happened on Friday night, and more specifically the "pause," but appellant could not recall any of the specifics of the conversation.

*C. Testimony of Staff Sergeant (SSG) Rice*

When the government announced that it was calling SSG Rice as a witness, the defense objected on both relevance and Military Rule of Evidence (Mil. R. Evid.) 403 grounds. Specifically, counsel asserted that "even if relevant and probative, the probative value [of SSG Rice's testimony] is substantially outweighed by confusion of the issues and a waste of time." In response, trial counsel asserted that SSG Rice would testify to a "statement the accused made to them [sic] regarding a sexual encounter, where the accused stated that he continued to have sex with a female over her objections . . . . that [] happened two years ago, roughly around the same time

---

[5] Appellant did not actually testify at trial, but rather counsel admitted and played his prior testimony from the Article 32, UCMJ, preliminary hearing.

of the incident with [SGT AK]." The military judge overruled the objection without engaging in a balancing analysis or otherwise providing any basis for his ruling.

On direct examination, SSG Rice testified to a conversation that he had with appellant approximately two years earlier, in which appellant described how he had a "girl" over to his house the past weekend and "was killing her out" while she was saying "No, Papi, no."[6] At first he did not think anything of it, but after later speaking with another noncommissioned officer (NCO) and learning of the charges brought in this case, SSG Rice realized that appellant may have been describing his encounter with SGT AK.

On cross-examination SSG Rice admitted that this conversation happened "maybe around 2 years ago," and could have occurred either before or after 14 July 2017. He also stated that he understood the term "killing her out" to refer to moaning during a consensual sexual act. Likewise, SSG Rice explained that "No, Papi, no" was a Hispanic term that he believed appellant was describing in relation to a consensual encounter.[7] Staff Sergeant Rice reiterated that the "girl" in the story went to appellant's house, and that appellant never told him her name. Finally, SSG Rice testified that SGT AK was not Hispanic.

## LAW AND DISCUSSION

### A. Factual Sufficiency

In pertinent part, Article 66(d)(1), UCMJ, provides that this court may "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact." In doing so, we are required to undertake a de novo "fresh impartial look at the evidence," and need not give deference to the findings of the trial court. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). On the other hand, our ability to conduct such a "factual sufficiency" review is not completely unfettered.

Rather, Article 66(d)(1), UCMJ, mandates that in conducting such an assessment, we must recognize "that the trial court saw and heard the witnesses." As such, the test for factual sufficiency is "whether, after weighing the evidence in

---

[6] Staff Sergeant Rice testified on 6 August 2019, and the date of the alleged assault was 14 July 2017. Staff Sergeant Rice first testified that the conversation was "well over two years ago," but then clarified that it was "roughly" two years ago, although he did not remember what time of year it was.

[7] The defense did not, however, follow up or cross-examine SSG Rice regarding his testimony that his initial impression of the conversation changed after he learned of the charges in this case and spoke with another NCO.

the record of trial and *making allowances for not having personally observed the witnesses,*" we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (emphasis added). In *United States v. Crews*, ARMY 20130766, 2016 CCA LEXIS 127, *11–12 (Army Ct. Crim. App. 29 Feb. 2019 (mem. op.), we further explained:

> The deference given to the trial court's ability to see and hear the witnesses and evidence—or "recogni[tion]" as phrased in Article 66, UCMJ—reflects an appreciation that much is lost when the testimony of live witnesses is converted into the plain text of a trial transcript. While court-reporter notes may sometimes reflect a witness's gesture, laugh, or tearful response, they do not attempt to reflect the pauses, intonation, defensiveness, surprise, calm reflection, or deception that is often apparent to those present at the court-martial. A panel hears not only a witness's answer, but may also *observe* the witness as he or she responds.

Likewise, in *United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015), *aff'd on other grounds* 76 M.J. 224 (C.A.A.F. 2017), we held that "the degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witnesses is at issue."

On a more general level, in *United States v. Conley*, 78 M.J. 747, 752 (Army Ct. Crim. App. 2019), we held that the expansive authority given to us under Article 66, UCMJ, should serve as a "safety valve of last resort." As such, while our authority under Article 66, UCMJ, is in no way limited to discrete issues, "on a practical level the exercise of this unique power is more likely to be found in certain military circumstances . . . born from uniquely military origins." *Id.*

As is often the situation in disputes over sexual assault, this case essentially comes down to a credibility determination between appellant and SGT AK. Contrary to what appellant now suggests, however, the mere fact that he testified to a different or exculpatory version of the incident does not necessarily mean that there is a "fair and rational hypothesis other than guilt." If this were the law, not many sexual assault convictions would survive appellate review.

Here, appellant did *not* testify at his court-martial, but rather counsel played his relatively brief preliminary hearing testimony. Although he denied penile penetration, appellant admitted that there was a "sudden lull" during their encounter and that SGT AK did not answer when he asked if she was "good." Appellant also did not remember any conversations about relationship status, nor could he

remember any of the details of his subsequent conversation with SGT AK about what had happened between them and why she suddenly froze up.

On the other hand, the military judge was able to observe SGT AK as she testified. Although she was not able to remember all of the details of the sexual encounter, in contrast to appellant's perfunctory and somewhat evasive preliminary hearing testimony, for the most part SGT AK provided comprehensive, detailed, and logical answers to questions on both direct and cross-examination.

In sum, and in recognition of the trial court's superior position in making credibility determinations, especially in a case like this one, where the outcome in large measure depends on "the degree to which the credibility of the witnesses is at issue," *Davis*, 75 M.J. at 546, we agree with the military judge's implicit conclusion that SGT AK was the more credible witness. Accordingly, we find appellant's conviction factually sufficient. *See also United States v. Crowder*, ARMY 20150728, 2017 CCA LEXIS 624, *6 (Army Ct. Crim. App. 26 Sep. 2017) (summ. disp.) ("Here this case turned on the relative credibility of the witnesses. After taking into account that the trial court saw and heard the witness, we find the evidence factually sufficient.").[8]

### B. Legal Sufficiency

We also review questions of legal sufficiency de novo. *Washington,* 57 M.J. at 399. In conducting this review, "'the relevant question' an appellate court must consider is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 219 (1979)). "Such a limited inquiry reflects our intent to give full play to *the responsibility of the trier of fact* fairly to resolve conflicts in the testimony, to weigh the evidence, *and to draw reasonable inferences* from basic facts to ultimate facts." *United States v. Pabon*, 42 M.J. 404, 405 (C.A.A.F. 1995) (quoting *United States v. Hart*, 25 M.J. 143, 146 (C.M.A. 1987)) (emphasis in original) (internal quotations and citations omitted).

---

[8] Appellant also argues that because the bed in question was an air mattress on the floor, it would have been physically impossible for him to have sex with SGT AK while standing up as she described. Although at various points in her testimony SGT AK estimated that that the air mattress was anywhere between eighteen inches to three-feet high, she also testified that it was a "*regular* bed height, like a standard box spring with the other mattress, like a *normal* bed height would be."

Given the relatively low threshold for establishing legal sufficiency, and for all of the reasons discussed above, a reasonable factfinder could have found all of the essential elements of the sexual assault offense at issue beyond a reasonable doubt. Accordingly, we find appellant's conviction legally sufficient.[9]

### C. Testimony of SSG Rice

As described above, the defense objected to the testimony of SSG Rice on both relevance and Mil R. Evid. 403 grounds.

Military Rule of Evidence 401 provides that evidence is logically relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. *See United States v. Colon-Angueria*, 16 M.J. 20, 26 (C.M.A. 1983) (materiality factors include the importance of the issue for which the evidence was offered in relation to other issues in the case, the extent to which the issue is in dispute, and the nature of the other evidence in the case pertaining to the issue).

Under Mil. R. Evid. 403, the military judge may exclude logically relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." *See also United States v. Stephens*, 67 M.J. 233, 236 (C.A.A.F. 2009) ("The overriding concern of M.R.E. 403 is that the evidence will be used in a way that distorts rather than aids accurate fact finding.") (citation and internal quotation marks omitted).

### 1. The military judge did not abuse his discretion.

We review a military judge's decision to admit or exclude evidence for abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 129–30 (C.A.A.F. 2000). But, where the military judge fails to conduct a Mil. R. Evid. 403 analysis, as is the

---

[9] Appellant also claims since SGT AK did not resist when he walked her over to the bed, he was at a minimum reasonably mistaken in his belief that she consented. First, SGT AK's repeated insistence prior to the encounter that she did not want a physical relationship with appellant should have put him on notice that she did not want to have sex with him. In any event, SGT AK settled the issue in the middle of the encounter by shaking her head "no" in response to appellant's question about "wanting to do this." *See United States v. Rouse*, 78 M.J. 793, 796 (Army Ct. Crim. App. 2019) (noting there is an absolute right to withdraw consent in the middle of a sexual act that started off as consensual).

case here, we give no deference to his ruling and must instead conduct the Mil. R. Evid. 403 balancing test ourselves. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000). As we recently reiterated, "[n]otwithstanding this court's well-established guidance to military judges to place their Mil. R. Evid. 403 analyses on the record . . . the military judge failed to conduct a Mil. R. Evid. 403 analysis, let alone place that analysis on the record for our review." *United States v. Butler*, ARMY 20180385, 2020 CCA LEXIS 188, *11 n.8 (Army Ct. Crim. App. 29 May 2020) (mem. op.) (internal citation omitted).

As noted above, when the government called SSG Rice, the defense objected on both logical and legal relevance. With respect to the Mil. R. Evid. 403 objection, the defense argued that even if relevant, the probative value of SSG Rice's testimony was substantially outweighed by confusion of the issues and a "waste of time." In response, the government submitted that SSG Rice would testify that roughly around the time of the charged assault, appellant described a sexual encounter wherein he continued to have sex with a female over her objections.

As proffered, this evidence was relevant under Mil. R. Evid. 401 as it: (1) had "any tendency" to support a finding that appellant committed the charged assault and; (2) was offered in relation to the central issue in dispute in the case. Likewise, the probative value of this evidence was not substantially outweighed by the danger that it would confuse the military judge, distort the fact-finding process, or consume an undue amount of time.

Appellant further asserts, however, that SSG Rice's *actual* testimony (which differed from the proffer) was not relevant or admissible under Mil. R. Evid. 403. Among other things, appellant highlights that the proffer failed to account for the fact that SSG Rice was uncertain of when exactly the conversation occurred, that the incident in question occurred at appellant's residence, and that it likely involved a Hispanic female. Although appellant did not renew his objection or move to strike SSG Rice's testimony, he now contends that his initial Mil. R. Evid. 403 objection to the proffer preserved his right to raise the issue on appeal. While appellant cites no authority in support of his position, we agree that for appellate purposes his Mil. R. Evid. 403 objection to the proffer preserved the same objection with respect to the actual testimony of SSG Rice. *See* Mil. R. Evid. 103(b) ("Once the military judge rules definitively on record admitting or excluding evidence . . . a party need not renew an objection or offer of proof to preserve a claim of error for appeal"); *cf. United States v. McElmurry*, 776 F.3d 1061, 1066 (9th Cir. 2015) ("Arguing and

losing on the 403 objection sufficed to preserve it.").[10]

Nevertheless, although it is a somewhat closer call, the military judge did not err in admitting and considering the *actual* testimony of SSG Rice. Although SSG Rice's testimony may not have been as robust as proffered, its probative value was still not substantially outweighed by the danger of confusing the military judge. Nor did it consume an undue amount of time. The core of SSG Rice's testimony, that his initial impression of the conversation changed and that he believed that appellant might have been referring to the assault in this case, was not challenged or otherwise undermined on cross-examination. To the extent there were discrepancies about when the conversation took place, where the encounter occurred, and whether the female may have been Hispanic, those inconsistencies go more to the evidentiary weight of the testimony rather than to its admissibility. Put another way, even taking into account the variations between the proffer and the actual evidence, the testimony of SSG Rice did not "distort[] rather than aid[] accurate fact finding." *Stephens*, 67 M.J. at 236.

Finally, to the extent appellant is claiming that the government used the testimony of SSG Rice to "smuggle" in similar sexual assault propensity evidence without the proper notice and safeguards of Mil. R. Evid. 413, we are confident that the military judge did not consider the evidence for this purpose. *United States v. Rodriguez*, 60 M.J. 87, 90 (C.A.A.F. 2004) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)) ("Military judges are presumed to know the law and to follow it absent clear evidence to the contrary.").

### 2. *Even if the military judge erred, appellant suffered no prejudice.*

Assuming arguendo the military judge erred in overruling appellant's objection and allowing SSG Rice's testimony, we conclude appellant suffered no prejudice. As our superior court held in *United States v. Solomon*, 72 M.J. 176, 182 (C.A.A.F. 2013), "[w]hen a military judge abuses his discretion in the M.R.E. 403 balancing analysis, the error is nonconstitutional," such that the government must "demonstrate that the error did not have a substantial influence on the findings." In assessing potential prejudice, we weigh the strength of the prosecution's case, the strength of the defense case, the materiality of the evidence in question, and the quality of the evidence. *United States v. Barnett*, 63 M.J. 388, 397 (C.A.A.F. 2006).

---

[10] Given our ruling *infra*, we leave for another day the issue of whether the military judge had a sua sponte duty to revisit the Mil. R. Evid. 403 objection at the conclusion of SSG Rice's testimony. Regardless of whether such a duty exists, however, a military judge seeking deference to his or her Mil. R. Evid. 403 rulings might consider it prudent to reassess and restate the balancing test when a witness's actual testimony does not match the proffer.

Here, for all of the reasons set forth in our factual sufficiency review, because SGT AK was more credible than appellant, the government had the stronger case. Moreover, given all of the discrepancies in SSG Rice's testimony pointed out by appellant, even if erroneously admitted, SSG Rice's brief testimony was marginal at best and likely had little, if any, impact on the military judge's findings. As such, the admission of SSG Rice's testimony was not prejudicial because it did not substantially influence the findings.

## CONCLUSION

The findings of guilty and the sentence are AFFIRMED.

Chief Judge KRIMBILL and Senior Judge BROOKHART concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court